MADDOX, Justice
(concurring specially).
I concur in that portion of the opinion which reads as follows:
This Court agrees with Contestant that the evidence contemplated by the literal terms of § 17-15-21 cannot be reconciled with the particular grounds of § 17-15-1(1). Although § 17-15-1(1) expressly provides for contest on the grounds of “malconduct, fraud or corruption on the part of any inspector, clerk, marker, returning officer, board of supervisors or other person,” once contest is filed stating malconduct as its grounds, the contestant is then apparently prevented from proceeding with his case because his inability to comply with the demands of § 17-15-21 prohibits his taking of testimony necessary to prove his claims.
While the language of § 17-15-21 does not explicitly mandate a method by which notice of the nature of the evidence in a contest based on malconduct of the election officials must be given to the contes-tee, the statute implicitly contemplates that notice of a sort applicable to the grounds asserted be required. If this were not true, a statute permitting mal-conduct as a grounds for a contest would be useless absent a means to proceed under the notice requirements of § 17-15-21. Moreover, the lack of a remedy to enforce the statutory right of contest would be an obvious violation of a contestant’s due process rights.
In this ease, contestant appénded to his brief on appeal a copy of a newspaper article which indicated that a vote total posted by poll watchers on the night of the election differed from the official canvas, and that the difference would have changed the result of the election, if the total posted by the poll workers was correct.[1]
*347 Counsel for contestant, at oral argument, stated that he, if given a chance to take the testimony of election officials, would be able to prove his allegations of which absentee ballots were illegally counted or rejected. At oral argument, counsel" also alluded to the statements made in the newspaper article; however, contestant, in his “Notice of Nature of the Evidence,” never included the statements contained in the newspaper account. In this ease, I agree with the result of the holding because I do not believe that the contestant legally complied with the requirements of § 17-15-21, and therefore, was not permitted to take testimony to prove his allegations of malcon-duct.
Because the contestant failed to set out in his “Notice of Nature of the Evidence” sufficient facts to show wherein and how the election officials were guilty of malcon-duct, I concur that the judgment of dismissal was appropriate. Had the. contestant here stated in his “Notice of the Nature of the Evidence” the fact that he would call witnesses who would testify to facts similar to those contained in the newspaper article, I would conclude that he had substantially complied with the requirements of § 17-15-21, and would have then been entitled to take the testimony of the election officials. In short, the contestant must have based his allegations of malconduct upon some evidence, but in his “Notice of Nature of the Evidence,” he did not set out substantially what the evidence was; therefore, he failed to comply with the requirements of law.
TORBERT, C. J., concurs.

. The newspaper article, in part, reads:
Irregularities in the way absentee ballots were counted for the general election Tuesday cast a shadow of doubt on the accuracy of the final tally for the down-to-the-wire County Commission District 2 race.
***** S»!
About 2,200 absentee ballots were cast. They have not been individually recounted to certify the totals announced late Tuesday night.
A probate court official this morning told the Mobile Press the court does not have the authority to recount them.
In all, 693 absentee votes were cast for Carter and 570 for Wiley, according to the tabulations posted by poll workers Tuesday night.
THE PROCEDURE used for the initial count was to divide all 2,200 absentee ballots into 10 groups. Each group was called a box, and a six-person team of poll workers was assigned to count and record each vote by hand.
All of the teams did not employ the same method for tabulating the ballots in their boxes, but the most commonly used method was as follows:
While one team member read the names a particular voter selected, another member watched over his shoulder to ensure accuracy.
The purpose for twin tally sheets, election officials explain, was to double-check the totals for each candidate.
But the team for Box 1 was given only one tally sheet, and had no way to double-check its results without recounting each ballot. The team, which finished its task first among all 10 absentee boxes, did not double-check by recounting.
WHEN ASKED about the discrepancy Tuesday evening, an election official said the Box 1 team performed its task conscientiously — as did all the teams — it may have slipped without realizing it.
The need for twin tallies became obvious as other teams finished and began comparing figures. The Box 3 team, for example, found *347 a number of discrepancies in its tallies for various candidates. In each case, the team went back through every ballot and recounted votes before issuing a final tally.
The counting was laborious process, and some workers complained they were tiring. One jokingly said her eyes were ‘crossing.’ Others commented they would dodge the job if asked again.
The last team finished shortly after 11:30 p.m., having spent five and a half hours counting ballots.
NOT ALL OF the teams recounted to achieve accuracy after finding discrepancies between figures on their tally sheets. At least two teams simply split the difference between divergent figures and called that the official tally.
Also, as the task stretched toward midnight, the members of some teams stopped double-checking each other as they read and recorded votes. In its final hour, for example, no member of the last team to finish looked over the reader’s shoulder to verify accuracy.
Instead, while two team members recorded the votes called out, all four other team members separated the remaining ballots into four stacks and took turns calling.